172109 FWP v. Biogen. We're sitting out here talking about how much fun tax is. Finally, we get to a patent case. I never thought I'd be happy to see a patent case, but here we are. Good morning, Your Honors. Well, I'm happy to see you, too. Kathleen Sullivan for Forward Pharma. The sole issue on appeal is whether Forward's application contained adequate written description to support the asserted claim. It does, and the Board erred in finding otherwise. The claim is very simple. It has three elements, a dose, a drug, and a disease. 480 milligrams a day. As mentioned, expressly three times in the disclosure. Exactly, Your Honor. Of dimethyl fumarate to treat multiple sclerosis. And, Your Honor, I'll go right there. The Board found it was expressly disclosed three times in the disclosure. Let's look to what the Board found about the upscale table, which appears in the appendix at pages 160 to 162. Where does the 871 application explicitly say that that dosage, 480, or any of the dosages in the upscale table, are relevant generally to every condition listed in the application? Your Honor, the Board found that it did. The Board finds at A-22 that one skilled in the art would have recognized that the inventors had considered those fumarates to be significant in treatment of the listed conditions and diseases. So, Your Honor, let me go through it in steps if I could. Dose. The dose is there, as you said. The dose of 480 milligrams a day is expressly mentioned three times in the disclosure, including in the upscale table. That's the Board's finding at A-22. It also finds at A-14 that the dosage of 480 milligrams a day was specified in the upscale table. There's no ambiguity. The dose is there. Second, 871 says the daily dosage depends on a number of factors, including the condition or disease to be treated. That's not right, Your Honor. If you reread that clause, it says a number of factors, including age, weight, and the underlying causes of the condition to be treated. And the fact that a physician might vary the dosage for somebody based on their being too old or too thin or having multiple comorbidities has nothing to do with whether the 481 milligram a day dose was disclosed. Now, Your Honor, the drug is disclosed. Let's go to the second one of the Board's findings. I want to show you that the Board's factual findings are all there, and it's a legal error that led them not to see the disclosure. Can we just stay with the upscale table? Yes, Your Honor. I'm concerned about the reliance on the upscale table as being a therapeutically effective amount of this particular drug for treating any of the conditions when, as I see it, it seems like it's an intermediate level of a drug that you're ramping up, so that you're, through this controlled administration, you're helping someone to get used to the drug and avoid any GI side effects. That's exactly right. If they're more designed to get the patient to get acclimated to the particular drug, why am I misreading that? You're not, Your Honor, but there's no inconsistency between that acclimation schedule and 480 milligrams a day being therapeutically effective. Here's why. The claim has no temporal limitation. It doesn't say therapeutically effective for X result within Y time. And, in fact, therapeutically effective was never construed by the Board. The Board didn't say it was an additional limitation. And, in fact, the claim here defines 480 milligrams a day as therapeutically effective. It says we're in 480 milligrams a day is a therapeutically effective dose. That's the claim. Now we're talking about the upscale table. Yes, Your Honor, but the upscale table is, let me go to the third step. So this first step is 480 is there. Second step is the drug is there. There's no question that DMF and MMF are called out, as the Board says, in significant detail in the disclosure. Now, Your Honor, if you go to 160 and 162, you see that the kits here, the kits for administration of the drug over the up titration schedule, getting the patient used to the drug over many weeks, the kits tie together the dose, the drug, and the disease by saying that the kits are used to contemplate it to be suitable for use in the treatment of multiple sclerosis. Now, Your Honor, therapeutically effective is perfectly consistent with getting the patient used to the drug. There's no question that reducing the side effects only matters if you're treating the patient in a way that is therapeutically effective. That's the point. We have to give deference to the Board on these written description matters. And if the Board says, well, we read this upscale table differently than Ms. Sullivan, we read it more as this acclimation schedule, this ramp up to before we get to the therapeutically effective amount, in order to avoid gastrointestinal side effects due to, I don't know, the strength or relative toxicity, perhaps, of this given drug, these fumarates. And so the Board concludes, well, this upscale table is not disclosing therapeutically effective amounts. Why would we say that that was an unreasonable reading of the upscale table? So two answers, Your Honor. The Board did not find that. The Board, if you look to 827, found that this was therapeutic use. It found that the upscale table is consistent with therapeutic use. And we cite in the Gray Brief at page 11 multiple times where the Board talked about therapy and treatment in connection with the upscale table. Can you point me to the quote that you're referring to at 827? I'm sorry. 827, I think, is what you said.  I didn't mean 827, Your Honor. I meant that the Board refers to therapy. Well, I guess what I'm wondering is I thought I heard you say that the Board made a fact finding that the upscale table discloses therapeutically effective amounts of dosage forms for this particular fumarate. And I'm wondering where did the Board say that? So, Your Honor, on appendix 11, the Board says, with respect to the treatment of specific diseases and conditions, FD's specification lists uses of the described fumarate formulations as well as possible doses. Look at the paragraph. At 822, it says with respect to treatment of MS with a dose of 480 milligrams a day, the written description does not indicate 480 milligrams a day is a therapeutically effective dose with respect to any condition or disease, or is otherwise of any particular significance with respect to treatment of MS or any other disease. And, Your Honor, that's my second answer to Judge Chen's question. That line about particular significance was legal error. And you do not need to defer to the Board on legal error. You should overturn the Board on its legal error. Why doesn't that indicate that the PTAB's written description decision doesn't turn on the construction of therapeutically effective amount? It doesn't turn on it, Your Honor. It doesn't turn it on at all. What the statute requires is written description. The claim isn't for therapeutic. So there's no reason to reach that issue. That's right, Your Honor. That's absolutely right. So I guess going back to what Judge Wallach quoted, the written description does not indicate 480 milligrams per day is a therapeutically effective dose with respect to any condition or disease. Why is that an unreasonable reading of the application? Well, Your Honor, the application discloses to the person of skill in the ART that all of the listed doses in the upscale table are effective for all of the listed diseases. Eight doses, 24 diseases. And there's no question that if you had any doubt about all the diseases, a person of skill in the prior ART would certainly know that they're effective for psoriasis and for multiple sclerosis. The prior ART was overwhelming. The board erred in ignoring the prior ART. So to the extent the board made a factual finding, it was clear error. The disclosure has the three ingredients. And if you have any doubt about therapeutically effective, Biogen's own patent, the 514 patent, defines therapeutically effective as anything between 0.1 and 1 gram. 0.1 and 1 gram, 100 milligrams and 1,000 milligrams. 480 is in that range. But maybe that's something they invented, not something that these inventors invented. Oh, it's most definitely not, Your Honor. We were the first to claim and disclose 480 milligrams a day as a therapeutic treatment for multiple sclerosis. And I want to go back to the legal error here, because I think it's crucial. I think the most important point is this court has two very well-developed lines of cases. And the board put us in the wrong line. They thought this was a Ruchig-Novazim's case in which there's a disclosure of the forest and there need to be blaze marks through the unmarked trees. This is not a Ruchig-Novazim's situation. We disclosed a set of marked trees. This is a species claim. It's not a genus claim in which we later – it would be a genus claim if we had said, let's claim – let's disclose fumarates as a treatment for inflammatory conditions. And then Biogen came along and said, oh, DMF works for MS at 480 milligrams a day. That's not what happened. We disclosed DMF at 480 milligrams a day for 480 – for multiple sclerosis. We just disclosed it with several other titrated amounts. A 67-page application mentions MS five times, three times in the spec, twice in the original claim. Each time it listed it as one of 11 autoimmune diseases. Autoimmune diseases are only one out of 10 of the wide-ranging conditions.  It's eight dosages or six preferred dosages in the original claims and 24 conditions. Out of thousands of conditions, inflammatory conditions, the scientists in our patent had found that these inflammatory and autoimmune conditions were linked. They had common disease mechanisms. So it's not surprising that fumarates in these specific dosages were helpful in the therapeutic treatment of those diseases. But, Your Honor, I want to get to what you just said doesn't matter. And it's your decisions or your predecessor court's decisions. What you say matters more than anything, Your Honor. But in your predecessor court's decisions in Snitzer and Driscoll, they decide this case. We are a Snitzer-Driscoll case in which we list several trees, marking them all. We did not list a forest and then claim an unmarked tree. And Snitzer and Driscoll are precisely on point for your question, Judge Wallach. And that is because in Snitzer, too, the party you lost tried to say, well, there's so many different disclosures here and there's so many... And Snitzer said, it may be that were there boundless speculation, evident a different result would be reached, but not in that case and not here. In other words, this isn't a case where somebody walked through every dosage amount in the universe and claimed every treatment for every disease in the universe. It's a narrow list, eight specific doses for 24 diseases. And I want to point out that there's no need to pick and choose among the dosages precisely because it's an upscale table, Your Honor. What the upscale table teaches the person of skill and the art is every one of these doses is to be used to treat the disease. There's no picking and choosing. What if we disagree on the upscale table? Then where are we? If the court disagrees with your preferred reading of the upscale table... Your Honor, you wouldn't be disagreeing with me. You'd be disagreeing with the board. The board has three factual findings. Let's say we interpret the board's decision as saying what it said at page 22, that the written description does not indicate 480 milligrams a day is a therapeutically effective dose with respect to any condition or disease. And then there's other places where they say they look at the upscale table really more as a way and a means disclosed and contemplated to acclimate a patient to a given drug, not to actually provide therapeutically effective amounts. So if we find that, then where are we with your case? Your Honor, we still win under the original claims, which can be sufficient for the disclosure. And we win under the original claims because claim 44, original claim 44 discloses multiple sclerosis as a disease to be treated. Original claim 37 discloses 240 milligrams as a preferred dose. Original claim 30 discloses two times a day, which with respect to 240 would get you to 480 as a preferred administration. And original claim 27 discloses the use of DMF. So we win on the original claims. Those original claims, they were bizarrely complex to me. They seemed like this explosion of cross-referencing of all the different claims against each other. I don't know. It would take the patience of a yogi to try to map your way all the way through the different iterations when you have a claim 44 depending on any one of the earlier 43 claims. Not at all, Your Honor. First of all, it's a Danish patent. They don't follow our multiple dependency rules. But putting that aside, remember your law is that each claim is its own invention. And we claimed the invention in the original claims. But I want to say why you shouldn't disagree with me on the upscale table. I think you would be changing this circuit's law in a dramatic way that would weaponize Section 112 as a new weapon against conventional pharmaceutical claiming practices in which multiple doses for multiple diseases are applied. And you rejected that approach at your predecessor court in Schnitzer and Driscoll. You reaffirmed it in Script Pro. You said you're allowed to disclose a species among several species. You're allowed to disclose if you expressly disclose, even if it's among several species. Expressed disclosure ends the 112 inquiry. And we are a case that just as in Schnitzer and Driscoll, the invention is expressly disclosed as a unified whole in the upscale table based on the board's findings. The board made no factual finding to disagree with me. It made a legal error of saying, Oh, well, you still need blaze marks, and you need to call out particular significance. And that's what you rejected in Script Pro. That's what you rejected in Schnitzer. And if you impose a new blaze marks requirement on patents where there is an express disclosure, even if it is, as Novozymes itself conceded, would be fine, individually described as one of several possibilities, you're going to throw 112 law into a very different situation. Your Honor, I see I'm past my time. Thank you very much. I don't want to use up any of your time, Ms. Sullivan, but what I said when you said it doesn't matter, and I said what I say always matters, is not out of hubris, but because it gives counsel an opportunity to correct. Your Honor, I'm happy to take additional time to go back if I didn't give adequate response. I'm not asking for that. I'm explaining why I said what I said. I understood exactly, Your Honor. Thank you. May it please the Court, the judgment below should be affirmed for at least three reasons. The first has already been alluded to, which is the fact finding that there was no written description here is supported by substantial evidence, and indeed it was clearly correct. Secondly, it is never legal error to do a blazemarks analysis. That analysis has been sanctioned for more than 50 years in this court since Ruchig. When there is an express disclosure, when it is present, it is the ultimate blazemark. It wasn't present here. So you don't think that blazemark is another standard or a standard above and beyond what was said? No. It is the basic standard, and if you've got the express disclosure, you have a really clear blazemark. But that's the way, an appropriate way to do it. It is not legal error. What about Ms. Sullivan's final point, which is that numerous pharmaceutical patents include this kind of picking and choosing between them and that this would have a terrible effect if we were to do it? Well, that's not what the decided cases say. I admit there are a number of patents like that, and many of them have been struck down by this court. Are there claims for a compound where at this position it could be one of any 30 different things, and then at the next position it could be one of 40 different things, and then yet at a third position it could be one of 25 things? Would you say that there's a lack of written description if at position number one it's element seven and position two is element 14 of that list of 30, and then at position three it's element 24 of the possible 25 possibilities? Would that lack written description? Indeed it would. That's a perfectly legitimate way to describe a genus and claim a genus, but you cannot pluck the individual. In the genus you list all 25 at position one and all 30 at position two and all 25 at position three, and then if you ultimately claimed at a later date a specific composition that's inside all those different lists, that would lack written description? Indeed it would, and that's exactly what the Fujikawa case held. Fujikawa. I'm sorry. Let me go to another one. What about a bicycle? Where it was, I claim a bicycle, and here are three really important elements. I want a tire, and here's a list of 20 different kinds of tires. I want a good bicycle seat. Here's one of 20 bicycle seats. And I want a good braking system. Here's a list of 20 braking systems. And then I later claim a particular braking system, and tire that I had listed and contemplated. That would lack written description? And the short answer is? You're going to say yes? No. Okay. I'm going to say, well, we don't have decided cases that deal specifically with that. The cases we have are in the pharmaceutical area where things are much less predictable. So what's the problem? I mean, what is the problem with the pharma example I gave and the bicycle example I gave? Well, in the pharma example, as the court said in Fujikawa, laundry lists like that don't lead to particular combinations. And indeed, it was the holding in Novozymes as well. Well, let's just think about that out loud. I mean, unless you are necessarily reaching a conclusion that someone didn't possess everything that was listed because of some reason. And that reason must be because you don't believe that those different combinations would actually work for its intended purpose. And that sounds more like an enablement defect or something like that than a written description defect. You've actually literally described in your lists the different possibilities at the different positions, whether it's for a bicycle or a compound. What you've described is a generic invention. And you can have generic inventions that coexist with more specific inventions because very often the broad generic claim doesn't describe, doesn't anticipate, doesn't even render obvious the narrower invention. And the case we have here is the classic written description case where somebody with a broad blunderbuss disclosure realizes that somebody else, Biogen, has made and developed a very valuable specific invention who goes back with the benefit of hindsight and picks one from column A and one from column B and one from column C and says, aha, I had it all along. And that is exactly what the Ruschig, Fujikawa, Purdue, and Novozymes cases say is wrong. You can have a written description of a genus that does not guide the woodsman to specific trees. And that's exactly the problem here. The idea that I've got this broad disclosure of vast numbers of three different things and therefore I've described all combinations that was specifically rejected in Fujikawa, specifically rejected in Novozymes. Novozymes specifically said that the Schnitzer analysis falls apart when you have multi-component inventions, Schnitzer had picking one out of 14. But then your answer to my bicycle hypothetical ought to be that there's no written description for that particular claim to bicycle with the tire, the seat, and the brakes, right? Or wrong? Because I don't know if there's anything in Novozymes or Fujikawa that rests its holding on the notion that, well, this is pharma world, tricky science. We're not really sure whether any of this is actually enabled. It's not necessarily a question of enablement. In all these cases, say, once you tell the person the name, sure, they could make it. But there's nothing in your patent that even calls that name to mind, that directs them to make that, that causes them to think about it, that shows that you as inventor even envisioned it specifically. And this is why that your bicycle question is why these written description cases are questions of fact. And I could imagine a bizarre circumstance where the answer to your bicycle hypothetical might be perhaps they are all described. If there was nothing, if they were all described. If they were all described because it was done by name and there were 20 categories and 40 categories and 40 different names of types of tires were named. But there was nothing. What the scenario would be, suppose instead of having a generic bicycle, when you pick tire 15 and brake 43 and seat 59, all of a sudden the bicycle goes 10 times faster than any other bicycle described there. That person had no possession of that invention. And that's the sort of reaping where you didn't sow that the written description requirement is intended to prevent. And the fact of the matter is the fact finding here that it wasn't there is supported by substantial evidence and blessedly you don't have to decide the bicycle scenario since that was not before the board. To talk just a minute about the, you look like trouble. I want you to get to the upscale table because in some way this case might not be the selection of one from different columns of the menu and combine them all together to get your claim prevention. Instead, this is maybe just lack of any disclosure that reveals the inventors contemplated that 480 milligrams per day would be therapeutically effective for anything. That is exactly what the board held and that is exactly the core failing of the upscale table. The upscale table is for side effects. It's not for efficacy. The two MS clinicians who testified, Drs. Wynn and Buckle, said that people would not view a one week interim dose in that sort of situation as therapeutic. They never said that 480 milligrams per day was therapeutically effective for MS. Their upscale table blasts right through it on its way to 720 and that's the core failing with the upscale table. By not identifying a therapeutically effective dose for MS, they don't tell you where to stop in treating MS. All that discloses is adjusting for side effects up to a dose of 720. They never did disclose that the 480 milligram daily dose was therapeutically effective for MS. Indeed, the suggestion that the same doses are effective for everything that's listed in there is just strange credulity. Our witnesses testified that these 24 different diseases affect disparate organs with differing pathophysiologies, including generalized pain, which has nothing to do with multiple sclerosis. And Dr. Wynn testified at paragraph 47A, 18298, there's no expectation that one dose would be effective for all of those diseases. One point worth noting is reference was made to page 162 in the FP application saying that the compositions and kits said they could be used for everything. That doesn't say that. It says the compositions and kits according to the invention are contemplated to be suitable to use in the treatment of one or more of the following conditions, and they never identified which the one or more was. Does one or more mean all? One or more does not mean all. One or more means one or more, at least one, possibly more. I seem to recall that the other side's relying on the fact that perhaps by 2005 it was known in the art or through clinical trials that these particular fumarates were effective for multiple sclerosis. So does that somehow color our understanding of the description here? Retreat to the prior art is the last bastion of the inadequately described invention. We see it in all of the cases. Now let's talk about the facts of this case. Okay. But just to set the legal framework, the board said you can't reach into the prior art to do an obviousness type analysis to fill the voids in the specification. The Purdue case we cited says the blaze marks have to be in the specification. And the Lockwood case and the Goodell case and the Ariad case all stand for that proposition that it's not a question of what a person of ordinary skill in the art might, looking at the application, say, gee, I wonder if they thought of this even though they didn't disclose it. That's not the right analysis and that's what they're trying to do. There's nothing here, and indeed it isn't helpful. The prior art isn't helpful. Dr. Ravitch confirmed in paragraph 37 of his declaration, A7383, that in the prior art there's no disclosure of 480 milligrams per day of DMF and or MMF as a therapeutically effective dose for MS. And that's what's missing from this application. That is the key essential failure of this application that makes the board's decision that there was no written description supported by substantial evidence and that it shouldn't be affirmed. What about the original claims? If you're patient enough straight through the original claims, you could locate a claim scope that is directed to treating multiple sclerosis with these particular fumarates, I guess at a daily dosage of 480 milligrams. Well, to start at the very end, the original claims don't describe a daily dosage because they don't tell you how many pills you take at each administration. And page 161 of their own application shows that it can be different at different times in the day. So there's nothing in the claims that tells you a daily dose. But more important... One claim that says 240, and then there's another claim that says twice a day. It says the amount that's in the pill, and it says how many times a day. It doesn't tell you how many pills you take each time. And that's what you need to get the daily dosage. But more importantly than that, that backward march through that nested maze of improperly multiply-dependent claims is the sort of thing that you can only do with foreknowledge of the claimed invention. And in Novozymes and the other cases, they make clear you can't do it with hindsight. You have to look at the disclosure, including the original claims, and unguided by later knowledge of the invention, you've got to see that the inventor envisioned that particular thing as his invention. And we had testimony from Dr. Ravitch. We had argument from counsel pretty well acknowledging that they were shaping their review of the claims based on looking for the dose. And that is just a blatant hindsight reconstruction of the invention of the sort that's routinely rejected here. I would like to make one point before I sit down. I think it is correct, two points, that further claim construction isn't required. They construed the claim to the extent they needed to. There simply isn't any description anywhere on the patent of 480 milligrams being a therapeutically effective dose for MS. And therefore, under any reasonable construction of that term, they would fail. And lastly, my friend did correctly state the issue. The issue here is only Forward Pharma's specification and the written description there. There is some intimation in their reply brief trying to draw comparisons to Biogen's specification. Biogen's specification is not before the court. It is irrelevant. And more importantly, those arguments were waived by not having been raised below in connection with this motion and not having been raised in the opening brief. I have a quick question. Sure. You referenced 7383, the Ravitch Declaration, for prior purposes. What was your exact utilization of it? He stated very carefully that in the prior art there was no disclosure of 480 milligrams per day for therapeutically effective dose for MS. Okay. Thank you. Thank you very much. Thank you, Your Honors. Just very briefly, we are Judge Chen's bicycle hypothetical. There is express disclosure. Even though there's a list of 8 and a list of 24, we are express disclosure. We are not Novozymes. My friend likes Novozymes. He won Novozymes. This is not Novozymes. Novozymes would have come out the other way if there had been express literal disclosure of the claim. Novozyme turned on the fact that the substitution at location 239 in the alpha amylase enzyme, the substitution that was in the description was a substitution at 239 of tryptophan. The claim was for a substitution of glutamine. Had there been express disclosure of the substitution of glutamine for serine at location 239, Novozymes would have come out the other way. That would have been your exact pedal in the bicycle. So we are not Novozymes. Novozymes would have come out the exact opposite way if there had been express literal disclosure, even if it had been in a list. That's Schnitzer. Lists are okay, even if it's disclosed among several possibilities. Second, we're not a hindsight case. We didn't go out and troll later backwards to a generic claim for using fumarates to treat inflammatory conditions. We were the first to claim 480 milligrams a day of DMF to treat MS, and we did it. We disclosed that in the upscale table, and the upscale table tells POSA it's mandatory to give all the doses. You give all the doses. The doses are listed in an upscale precisely because each of them is mandatory to treat all the listed diseases. As to the prior art, Your Honor, it was error to completely ignore the prior art. The prior art is overwhelming in 2005 that DMF is effective to treat MS. You can look to the Joshi patents. There's three of them. We made a reference to the 376 patent, which plainly taught the use of fumarates to treat DMF and MS. Should 2004 be the right frame of reference because the priority date for this PCT was 2004? Yes, Your Honor, but we cite to prior art pre-2004 Joshi patents. The Shimrick studies in particular, which were using up titration of DMF to treat MS in particular, and one of the Joshi patents was filed in 2002. So we're citing to prior art that plainly predates 2004, and it was an additional error to completely ignore it. We think with the express description we had, even though it was in a list, we're plainly in schnitzer and driscoll. We're not in novazymes. And, Your Honor, my friend is right that we all thought the point of novelty was the 480 milligrams. That particular number, that's the point of novelty. That 480 milligram dose that we called out in our application, and then they later patented under the 514, that was novel, but it was not novel to connect DMF to MS, which is what the board seemed to be finding missing. And finally, Your Honor, one or more is a red herring. One or more, if you look at it, simply means a patient might have one or more conditions at the same time. If you look at A163, it references the comorbidity problem, and in fact, if you look in the record at 18747, A18747, you'll see that Biogen's expert admitted that he commonly treats people who have MS and psoriasis and Crohn's and Hajimoto syndrome at the same time. We disclosed the use of eight doses to treat all 24 diseases. It was mandatory. A person of skill in the art would have known it from the prior art. You should reverse. Thank you. Thank you. We thank both sides, and the case is submitted.